UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
09-CIV-20472-HOEVELER

INSPIRATION YACHT CHARTERS, INC.,

 Plaintiff,

v.

INSPIRATION YACHT CHARTERS, II, INC.,
and ALLIED MARINE, LLC,

 Defendants.


FINDINGS OF FACT AND
CONCLUSIONS OF LAW

 This lawsuit was tried before the Court, without a jury, from May 10 to May 15, 2010. In rendering judgment following a non-jury trial, Rule 52(a) requires the district court to make specific findings of fact and to state conclusions separately. The rule "does not require a finding on every contention raised by the parties," but requires the court to provide sufficient detail demonstrating that care was taken in ascertaining and analyzing the facts necessary to the decision and providing "sufficient particularity" to facilitate meaningful review. Feazell v. Tropicana Prods., Inc., 819 F.2d 1036, 1042 (11th Cir. 1987). Thus, in accordance with the requirements of Rule 52(a), having heard and considered all of the testimony, evidence, and arguments presented at trial, the court now enters the following findings of fact and conclusions of law.

1

## I.  Background and principal contentions of the parties

The case involves an unsuccessful yacht sale. The plaintiff was the yacht owner and seller, Inspiration Yacht Charters, Inc. ("the seller"), and the defendant was the expected buyer, Inspiration Yacht Charters II, Inc. ("the buyer"). Also involved in the case as defendant/counter-claimant/cross-claimant is Allied Marine, LLC, which was involved in the transaction in several capacities: as seller's broker, escrow agent for the $690,000 deposit, then later, as escrow agent for the $6,310,000 balance of the purchase price.

There are three major aspects to the dispute: first, the contract dispute between seller and buyer; second, the dispute between seller and its broker Allied Marine concerning Allied's alleged disloyalty; and third, Allied Marine's claim for attorney's fees against both the seller and the buyer, and claim to recover its expected commission on the sale.

With respect to the first aspect of the case, the seller and buyer both claim the other side breached the purchase and sale agreement by failing to close on the transaction, and both claim entitlement to the buyer's $690,000 security deposit. The seller argues that the yacht sale was consummated because properly-authorized agents for both sides met in the Bahamas on the closing date and executed the necessary documents to transfer title of the yacht. According to the seller, everything that needed to be performed under the contract was performed, and the buyer accepted

2

possession of the vessel; the buyer nevertheless instructed Allied Marine to withhold payment of the $7,000,000 purchase price and demanded new closing documents from the seller. By the time the seller executed new documents the buyer had lost interest in buying the yacht and terminated the contract. Conversely, the buyer argues the sale never took place because the seller failed to transfer title of the vessel at the closing. Specifically, the buyer submits that (1) the warranty of titled signed by the beneficial owner of the yacht was defective, (2) the seller's agent at the closing lacked power-of-attorney to execute a bill of sale, and (3) the bill of sale lacked an apostille.[1]

With respect to the second aspect of the case, the seller argues that Allied breached its fiduciary duty to the seller because Allied never disclosed a crucial detail about the financing: *i.e.*, that when Allied accepted the buyer's purchase funds several days before the closing, Allied placed the money in an escrow account. Because of the alleged non-disclosure, the seller mistakenly believed Allied Marine was duty-bound to release the buyer's money the moment the paperwork was signed in the Bahamas, without the possibility the buyer could inspect the closing paperwork or interrupt the payment. The seller attempted to prove it would not have transported the vessel to Freeport if

---

[1] An apostille is a stamp or seal obtained after a document is notarized, signifying that the notary who witnessed the signature is a true and correct notary.

3

Allied disclosed the escrow arrangement, and thus Allied's disloyalty was the proximate cause of the seller's $146,000 of expenses incurred while the vessel sat in the Bahamas until it was sold to a different buyer.

With respect to the third aspect of the case, Allied Marine asserts a counter-claim against the seller and a cross-claim against the buyer for reimbursement of attorney's fees incurred in defending this lawsuit, based on a fee-shifting provision in the Brokerage Agreement that allows Allied to recover litigation fees from the party or parties who have breached the contract. Finally, Allied seeks to recover either: (1) its share of the $690,000 liquidated damages, if the Court determines the buyer breached, or (2) its expected commission on the yacht sale, if the Court decides the seller breached.

## II.  Findings of fact[2]

### A.  Procedural history

1    The case was filed on February 24, 2009. The seller's amended complaint initially contained twelve counts against the buyer and Allied. ECF No. 2-1, February 25, 2009. Several weeks later the seller voluntarily dismissed all of the counts except: (1) breach of contract against Allied (Count I); (2) breach of fiduciary duty against Allied (Count II); (3) breach of contract against the buyer

---

[2] The facts of this case are essentially undisputed, but to the extent there were material discrepancies in the evidence, these are noted where relevant.

(Count VI); and tortious interference with a business relationship against the buyer (Count VII). <u>See</u> ECF. No. 25, March 23, 2009. The plaintiff's tortious interference claim was subsequently dismissed by the Court, upon the buyer's motion for judgment on the pleadings. <u>See</u> ECF No. 120, April 26, 2010.

2    A separate lawsuit was filed by the buyer against both the seller and Allied Marine in Palm Beach County Circuit Court on February 19, 2009. The case was removed to federal court March 10, 2009 and assigned Civil Action Number 09-CIV-80405. This Court accepted transfer of the case a week later, then granted consolidation of both actions into <u>Inspiration Yacht Charters, Inc. v. Inspiration Yacht Charters, II, Inc.</u>, 09-CIV-20472-HOEVELER. <u>See</u> Order of Consolidation, ECF No. 48, May 1, 2009. In its ruling on the motion for consolidation, the Court instructed the buyer to re-assert its claims from the Palm Beach lawsuit as counter-claims and cross-claims in 09-CIV-20472-HOEVELER.[3]

## B.    The interested parties

---

[3] In fact, the buyer never asserted counter-claims or cross-claims, but its position has always been clear: It wants to keep its security deposit and does not believe it owes Allied anything. Because of the Court's findings of fact and conclusions of law with respect to the seller's complaint, however, the buyer is not entitled to any of the affirmative relief it sought in its initial complaint.

3     Prior to the events in this lawsuit, the plaintiff, Inspiration Yacht Charters, Inc., was a Marshall Islands corporation with its principal place of business in the Netherlands. Its directors were Tjerk Visser and his brother Pieter Visser. Inspiration Yacht Charters, Inc., was the record owner of a 1996 156' yacht, the M/V INSPIRATION ("Vessel").

4     Defendant Inspiration Yacht Charters II, Inc., is a Marshall Islands corporation based in Palm Beach County, Florida, whose president is Glen Straub. Glenn Straub is also the president of KK Aggregates, Inc. ("KKA"), a non-party to this lawsuit relevant only to the extent that KKA initially entered into the purchase and sale agreement for the M/V INSPIRATION, before transferring its right to Mr. Straub's newly-formed company, Inspiration Yacht Charters II, Inc.

5     The seller engaged two brokers to sell the yacht. The "listing broker" was International Yacht Collection ("IYC") (a non-party to this lawsuit) and the "selling broker" was Allied Marine, LLC, a Florida corporation with its principal place of business in Broward County.[4] In addition, Allied Marine also served as escrow agent

---

[4] At trial the plaintiff's expert witness, Jeffrey Cox, clarified the different roles of the two brokers. The listing broker is hired by the yacht owner to market and advertise the vessel, and represent the seller's interests; the selling broker is the one who finds the willing buyer to make an offer on the boat.

with respect to the buyer's $690,000 deposit and, subsequently, escrow agent for the $6,310,000 balance of the purchase price.

6    Marine Documentation, Inc., which is not a party to this action, was the documentation firm hired to prepare and disseminate paperwork required to transfer title and register the vessel, including bills of sale, power-of-attorney documents, corporate resolutions, and forms related to the transfer of registration. Additionally, Marine Documentation and its employee, Kelly Cool, acted a go-between for the buyer and seller on the transaction.[5]

### C.   **The Brokerage Purchase and Sale Agreement**

7    On February 4, 2009, the seller and KKA entered into a

Both brokers are paid by the seller. Cox Tr. 10-11, May 12, 2010. The Court received Mr. Cox as an expert in yacht closings over the objection of buyer's counsel, because of Mr. Cox's extensive experience in the industry over many years.

[5] At her deposition, Ms. Cool explained her role: "I believe that I was assisting the seller up until a certain point and when we get to a certain point, then I was assisting the buyer all for the vessel. So after this point, yes, I would agree I was assisting the buyer." Cool Dep. 26:16-22, Nov. 18, 2009, ECF No. 150-1. Indeed, the record shows Ms. Cool was taking instructions from the buyer's lawyer, Craig Galle, in the days before and after the closing. See, e.g., Pl.'s Ex. 133. Frank Grezszczak of IYC testified that Glenn Straub originally hired Kelly Cool, and Mr. Straub's team was "driving the train and giving [her] instructions what to do," even though Tjerk Visser was apparently responsible for paying for her services. Grezszczak Tr. 85, May 11, 2009.  Mr. Grezszczak's assistant, Joyce Browning, also testified Kelly Cool was hired by the buyer. Browning Tr. 3, May 11, 2010.

"Brokerage Purchase and Sale Agreement" ("the Agreement" or "the contract") drafted by Allied Marine for the sale of the M/V INSPIRATION. The Brokerage Agreement appears on the record as Exhibit A to the complaint, ECF No. 2-1. KKA's interest in the Agreement was later assigned to the defendant, Inspiration Yacht Charters II, Inc.

8   Under the Agreement, the seller agreed to sell and buyer agreed to purchase the M/V INSPIRATION for $7,000,000. The buyer deposited $690,000 into Allied Marine's escrow account as a down payment on the vessel, pursuant to Paragraph 2 of the agreement:

> 2.   The purchase price is Seven Million Dollars ($7,000,000.00). The sum of Six Hundred Ninety Thousand Dollars ($690,000.00), ("Deposit"), is hereby paid to the escrow account of the Broker, acknowledged below, as a deposit toward the purchase price, and subject to the terms of this Agreement, said funds to be cleared into said account following acceptance by Seller.

9   Under Paragraph 5 of the Agreement, "[w]ritten or fax acceptance or rejection of the Vessel must be made by the Buyer to the Broker on or before 2/4/09." Glenn Straub, on behalf of the buyer, accepted the vessel as required by Paragraph 5 by signing an "Acceptance of Vessel" document on February 4, 2009, stating that:

> The undersigned, as Buyer for the above referenced vessel, hereby accepts the vessel and hereby acknowledges that all conditions have either been performed or are hereby waived. I selected the surveyor who is in my employ, notwithstanding the fact that my broker may have assisted me in hiring said surveyor, to inspect the vessel and I am completely satisfied and accept the

8

findings/reports of said vessel for the purposes of this transaction. I agree to accept delivery of said vessel and pay the balance due thereon under said contract and otherwise close this transaction in accordance with the terms therein.

In the event the purchaser fails to close this transaction as specified, the escrow agent is directed to forthwith pay the escrow deposit to the seller and broker in accordance with their agreement and upon such payment the escrow agent is released from any further liability as escrow agent.

Am. Compl., Ex. B, ECF No. 2-1.

10   After the buyer's acceptance of the vessel, the buyer's and

seller's obligations for performance of the contract were governed

by Paragraph 15 of the Agreement:

The Vessel is being purchased free and clear of all debts, claims, liens and encumbrances of any kind whatsoever, and the Seller warrants and will defend that he has good and marketable title thereto, provide a personal guaranty and indemnification from the Seller's beneficial owner guaranteeing the Vessel's title and lien free status, and will deliver to the Buyer all necessary documents for transfer of title to the Buyer before the closing. Final payment due at the time of closing shall be in the form of cleared funds. The preferred and accepted manner is for final payment by bank wire transfer. Any other form of payment must be made early enough to allow funds to be cleared on or before the closing date.

11   In sum, pursuant to Paragraph 15 the seller was required to

furnish: (1) "all necessary documents for transfer of title to the

Buyer before the closing," and (2) "a personal guaranty and

indemnification from the Seller's beneficial owner guaranteeing the

Vessel's title and lien free status."

12    The Agreement contained no provisions concerning where the M/V INSPIRATION must be eligible for registration after the closing, and the "necessary documents for the transfer of title" referenced in Paragraph 15 did not require to seller to furnish bills of sale with an apostille, even though such an apostille would have been required for the buyer to obtain permanent registration in the St. Vincent registry.

13    In Paragraph 21, the parties agreed that the Agreement "constitutes the entire agreement between the parties" and it is "understood that there are no other duties, obligations, liabilities or warranties, implied or otherwise" and the "Agreement may not be amended or modified, except in writing, signed by all of the parties hereto."

14    The consequences of non-performance by either side were governed by Paragraphs 13 and 14 of the Agreement:

> 13.  In the event the closing is not consummated due to non-performance of Buyer, including but not limited to a failure of Buyer to pay monies due or execute all documents necessary to be executed by Buyer for completion of the purchase by the closing date, all Deposit funds paid prior to closing shall be retained by the Seller and Broker as liquidated and agreed damages, and the parties shall be relieved of all obligations under this Agreement.  Buyer and Seller agree that the forfeited Deposit shall be divided equally with fifty percent (50%) of the Deposit disbursed to Seller and

10

fifty percent (50%) of the Deposit disbursed to the Broker(s). All expenses incurred on behalf of Buyer against the Vessel shall be paid by Buyer and shall not be deducted from the forfeited Deposit.

14. In the event the closing is not consummated due to non-performance of Seller regarding any of the covenants in this contract, all money paid or deposited pursuant to this contract by the Buyer shall be returned to the Buyer upon demand, less all expenses incurred on behalf of the Buyer; or the Buyer shall have the right of specific performance. Upon Seller's default, the full commission provided for under the terms of the listing contract shall be due and payable to the Broker by the Seller, and the expenses of the Buyer's survey/trial run become the obligation of the Seller.

15    Under Paragraph 6, the closing was originally scheduled for February 7, 2009 with delivery of the vessel to be made at a location "TBD" (meaning, "to be determined"). By addendums to the Agreement, the closing date was continued to February 11, 2009 and then to February 12, 2009, and the buyer chose the Bahamas as the place of delivery. See Am. Compl. Ex. D.

16    Paragraph 22 of the Agreement contained the provision regarding Allied Marine's attorney's fees in the event Allied is sued:

Should the Broker become party to any litigation involving this Agreement, it is agreed that the Broker shall be reimbursed for its costs and attorney's fees by the party or parties who have been found to have breached this Agreement.

D.    **Actions before the closing**

17    Leading up to the February 12, 2009 closing, the buyer,

through its director, Glenn Straub, executed a power of attorney authorizing Andrew Gallagher to execute the documents necessary to complete the purchase and sale of the vessel.[6]

18   On February 9, 2009, the seller, through its directors Tjerk and Pieter Visser, executed a corporate resolution appointing Tjerk Visser to execute "the Bill of Sale, Power of Attorney, together with any and all documents to effect transfer" of the vessel from seller to buyer, and appointing IYC broker Frank Grezszczak as "Attorney-in-Fact, to execute the Protocol of Delivery, Declaration of Delivery and Acceptance of Delivery to transfer ownership" of the vessel. Pl.'s Ex. 40 and 41.[7] Further, the corporate resolution

---

[6] At trial, Mr. Straub suggested that the day before the closing he told Mr. Gallagher over the telephone to "disregard the power of attorney" because Mr. Straub would personally attend the closing. Straub Dep. 76, May 14, 2010. The Court cannot accept Mr. Straub's recollection on this point because it is overwhelmed by the circumstantial evidence that Mr. Gallagher's authority was never revoked, including evidence of Mr. Straub's own conduct at the law office and boatyard in the Bahamas.

[7] Almost all of the exhibits introduced at trial were included in two binders comprising approximately 200 documents stamped as Plaintiff's Exhibits, most of which were scrutinized by witnesses at trial. Citations to the plaintiff's trial exhibits refer to the documents in these binders. Tjerk and Pieter Visser signed separate copies of the same corporate resolution. It appears that the dateline of the resolution signed by Pieter Visser was inadvertently not completely filled in when he signed it, as it reads: "This Consent shall be effective this ___9___ day of _____ 2009." By comparison, the accompanying resolution signed by Tjerk Visser was dated February 9, 2009. There was apparently no objection to these documents on or before the closing day. The Court is satisfied that the seller's February 9, 2009 corporate resolution was effective.

stated that "Tjerk J.A. Visser, or as instructed by either Director, is authorized to receive the proceeds of the sale of the vessel."

19   Also on February 9, 2009, Tjerk Visser, pursuant to his authority in the corporate resolution, properly executed a "Seller's Power of Attorney" appointing Frank Grezszczak as:

> Attorney-in-Fact for the purpose of executing and delivering on behalf of Inspiration Yacht Charters, Inc., a Protocol of Delivery and Declaration of Delivery and Acceptance to effect delivery of the vessel described as, INSPIRATION, St. Vincent And The Grenadines Official Number 4875, to Inspiration Yacht Charters II, Inc.

Pl.'s Ex. 44. When the closing date was rescheduled from February 11 to February 12, 2009 the seller became aware that Mr. Grzesczak would be unable to attend the closing in the Bahamas. Visser Tr. vol. 1, 20-21 May 10, 2010.[8] In response, an agent of Mr. Visser's typed Joshua Willis's name on the face of February 9, 2009 power of attorney document, and the modification was initialed and ratified by Mr. Visser (though not re-notarized). Id. at 22. In effect, Mr. Willis was given the authority to execute the documents necessary to complete transfer of the vessel.

---

[8] The Court initially permitted Mr. Visser to testify by video feed from Curacao, over the defendant's objection. The technology eventually encountered problems and the Court directed the witness to appear in person, which he did two days later. Any claim that the defendants were prejudiced by the video testimony is without merit.

20    Prior to the closing, there were three sets of bills of sale executed pursuant to Tjerk Visser's corporate authority. The first set was the bill of sale Mr. Visser executed in Holland February 9, 2009 and conveyed to Joyce Browning of IYC in Fort Lauderdale, which she then notarized in Florida without witnessing Mr. Visser's signature. Pl.'s Ex. 49. All parties agree this bill of sale was ineffective because of the improper notarization. The second bill of sale was executed by Mr. Visser in Holland February 9, 2009, and properly notarized in Holland. Pl's Ex. 39. There is no clear record of what happened to this version of the bill of sale; the evidence did not establish the seller used it in connection with the transaction or presented it to the buyer.[9] The third bill of sale was executed by Joshua Willis, as the seller's appointed attorney-in-fact, at the closing in the Bahamas on February 12, 2009.

21    In closing the transaction, the seller relied on the third bill of sale executed by Joshua Willis as the operative bill of sale. At trial, the buyer presented two objections to this

---

[9] The Court nevertheless takes note of Mr. Visser's signed and notarized bill of sale in Holland as one of the many circumstantial facts  presented at trial that, taken together, made it abundantly clear to the Court what all parties knew in February 2009: Mr. Visser owned the M/V INSPIRATION and intended to sell it to Mr. Straub, and Mr. Visser acted in good faith to do everything the buyer's lawyers asked of him to complete the transaction.

14

document, both pertaining to Mr. Willis's alleged lack of authority to sign it because of defects in the papers appointing Mr. Willis with power of attorney. The first objection was that someone apparently added Mr. Willis's name to the power of attorney with a typewriter after the document was notarized; the second is that the language of the power of attorney provision only gives Mr. Willis the legal authority to execute the "Protocol of Delivery and Declaration of Delivery and Acceptance," not the power to execute a bill of sale.

22   Prior to the closing, Tjerk Visser did not appoint an attorney-in-fact specifically to execute a bill of sale. Rather, the authority assigned to Mr. Grzeszczak and/or Mr. Willis was to execute a "Protocol of Delivery and Declaration of Delivery and Acceptance." Pl.'s Ex. 44. Nevertheless, the buyer never questioned Mr. Willis's ability to consummate the transaction in the Bahamas. Visser Tr. vol. 1, 23. All parties understood that Joshua Willis was authorized to execute the documents necessary to complete the transfer of the vessel, including the Protocol of Delivery and Declaration of Delivery and Acceptance, which essentially closed the deal and meant that the buyer accepted the documents conveying the vessel. Cox Tr. 36-37.

23   The buyer also argued that the Joshua Willis bill of sale was

ineffective because it lacked an apostille attesting to the authority of the notary who witnessed the document, Bahamian lawyer Kirk Antoni. No one disputes that an apostille is required to record a bill of sale in the St. Vincent registry. The buyer claims that since Tjerk Visser knew Mr. Straub intended to register the M/V INSPIRATION in St. Vincent, Visser must have known an apostille was crucial. Thus, the buyer argues that seller's obligation in Paragraph 15 of the Agreement to deliver "all necessary documents for transfer of title" actually meant something like, *all necessary documents for transfer of title in such a manner that the vessel can be registered in St. Vincent.*

24  Although the Court accepts that Mr. Visser knew the buyer intended to record the title in St. Vincent, the Court does accept that Visser knew about St. Vincent's local registration rules. Craig Galle, Mr. Straub's lawyer, testified that sometime around February 4, 2009 he had a conversation about apostilles with Kelly Cool and another woman from Marine Documentation, in which they:

> talked about the particular legal requirements, of the particular notarization requirements and apostille requirements for these bills of sale. . . to be effective in St. Vincent. And as a result of those conversations and communications, one of the documents that was prepared by Kelly cool was a document to be signed by her principal, the seller, recognizing that there's going to be a transfer within the same registry.

Galle Tr. 12:13-22. Mr. Visser indeed signed the perfunctory "Request to Transfer" form that Ms. Cool prepared, but its single

16

sentence makes no reference to registration requirements. Mr. Visser had not participated in the apostille conversation and there is no evidence he knew about it.[10] Although the buyer contends the "Request to Transfer" document is circumstantial evidence that Mr. Visser knew about the ancillary requirements of St. Vincent (as the stated transferee jurisdiction), the evidence actually cuts both ways, in that it would have just as reasonable for Mr. Visser to believe that buyer's counsel would continue to handle the administrative requirements necessary for recording title in St. Vincent.

25   Finally, the Court notes that a day before the closing, the buyer's agent and Mr. Galle both received an email with copies of the closing documents to be executed in the Bahamas, including: "Bill of Sale to be executed in Freeport, Bahamas before Kirk Antoni." If everyone anticipated that the bill of sale was to be executed and notarized in Freeport on the day of the closing, the buyer surely knew the document would *not* be apostilled that same afternoon. Yet the buyer never raised this issue, never suggested postponing the movement of the vessel to Freeport, and, so far as it appears, never instructed its attorney-in-fact to pause before

---

[10] The Court notes that Mr. Grezszczak testified that he personally knew nothing about the buyer's intent to register the vessel in St. Vincent, and thus would not have known about its local rules. Grezszczak Tr. 118.

17

signing the acceptance-of-vessel paperwork to look for the apostille. In other words, the buyer is seeking to fault the seller for overlooking an extracontractual requirement that nobody was particularly vigilant about until the buyer raised the issue on February 12 or 13. Based on a preponderance of the evidence, the Court concludes that the buyer's position concerning the apostille is without enough factual basis to consider further.[11]

**E.   Actions before the closing pertaining the purchase funds**

26   Two days before the closing, the buyer delivered to Allied Marine the $6,310,000 balance of the $7,000,000 purchase price, which Allied placed into its escrow account along with the deposit. Although the Brokerage Agreement explicitly called for the $690,000 deposit to be placed in escrow, the Agreement neither provided for nor prohibited escrow of the balance of the purchase price.

27   On February 11, 2009, Allied's representative informed the

---

[11] Even if the seller knew about St. Vincent's apostille requirement, the seller's contractual obligations are defined by the written Agreement, which did not require the bill of sale to comport with the requirements of any particular registry. Cox Tr. 83:24-84:4. Robb Maass, the maritime lawyer who advised the buyer surrounding the closing, testified at trial that the absence of an apostille would not prevent Mr. Straub from registering the vessel somewhere other than St. Vincent. Similarly, Kelly Cool testified that, in her experience dealing with yacht sales, it was uncommon to have bills of sale apostilled. Cool Dep. 28. The uncontested evidence is that a vessel owner can obtain a provisional registration in St. Vincent without an apostilled bill of sale, then seek permanent registration afterwards. Id. at 35.

seller's agent by email that Allied received the $6,310,000 balance of the purchase price. Although Allied did not expressly state that the money was received "in escrow," or that the money could not be released from escrow without the consent of both sides, the escrow arrangement was not a "secret agreement" since Allied's role as escrow agent should have been self-evident.[12] It would have been an obvious departure from ordinary business practices in the industry for the buyer to convey the money to Allied in its capacity as "seller's broker" before the yacht even departed for the Bahamas, and Tjerk Visser knew this. <u>See</u> Visser Tr. vol. II 127-130, May 12, 2010. Nevertheless, the seller claims that Allied breached its fiduciary duty of loyalty to the seller by failing to expressly disclose that Allied received the $6,310,000 in escrow.

28   Frank Grezszczak testified that the vessel would not have been moved to the Bahamas if the seller had known Allied could not unconditionally release the money immediately after the parties signed documents at the closing. Grezszczak Tr. 52-54, May 11, 2010. According to the seller, Allied's failure to disclose the buyer's ability to block payment (because the money was being held in escrow and was subject to ordinary escrow principles) was therefore the proximate cause of the seller's approximately

---

[12] The email simply stated: "[p]lease call me when you have a second. Also, we just received the funds from Mr. Straub." Pl.'s Ex. 76.

$146,000 in expenses in going to the Bahamas and waiting there for several weeks.[13]

29    Despite the testimony of Mr. Grezszczak, the Court finds that, based on a preponderance of the evidence, the seller would have moved the yacht to the Bahamas either way.  Throughout the litigation the plaintiff has never advanced any credible explanation for how it believed Allied was holding the money, if not in escrow. If Allied held the buyer's $6,310,000 with "no strings attached," the money would have effectively been under the seller's control prior to the closing, which would have been inconceivable according to experts from both sides. Indeed, from the buyer's perspective, the financing question was simply whether to: (1) willingly put the money in escrow, retaining the customary ability to prevent the release of funds if the seller breaches, or (2) retain the money in whichever private account it was in to begin with. Under any realistic scenario the buyer would have had the ability to prevent payment, whether doing so would be justified

---

[13] The Court notes that the seller is barred from seeking the $146,000 in expenses from the buyer because the liquidated damages provision in the agreement prevents consequential damages claims. In its post-trial submission, Allied argues it is also protected from liability for the $146,000 by the liquidated damages clause. But it is clear from Paragraph 13 the liquidated damages apply only "[i]n the event the closing is not consummated due to non-performance of Buyer"; the Agreement does not limit the seller's remedies against Allied in the event Allied breaches its fiduciary duties. However, because the Court finds that Allied did nothing wrong, this point is immaterial.

or not. If anything, the escrow arrangement benefitted the seller because Allied was also duty-bound to respect the seller's commands about how the money was disposed.[14]

30   The seller's expert, Jeffrey Cox, testified that the ordinary custom and practice in the industry is for the buyer to retain the balance of the purchase price in its own account, rather than in escrow. The evidence established that, if the buyer proceeded under the ordinary custom and practice, the buyer would not have released the purchase price, because the buyer was not satisfied the transaction was completed. Even Mr. Visser acknowledged at trial that he was aware that the nature of an escrow account means that the buyer must consent to the release of the funds.

**F.   The closing**

31   On February 12, 2009, the vessel arrived in Freeport, Bahamas

_____

[14] As it happened, once the buyer ordered Allied to return the $7,000,000, counsel for the seller immediately wrote Allied to object to the "release of any funds held by Allied Marine, LLC in connection with the sale of Inspiration Yacht Charters, Inc. pursuant to the Brokerage Purchase and Sale Agreement." Pl.'s Ex. 118. The phrase "any funds held by Allied Marine" in the counsel's letter obviously referred to the full $7,000,000, since the seller knew Allied was holding the whole amount. Suffice it to say, sometime after the vessel left for the Bahamas, but before this letter was written about a week later, the seller became aware that ordinary escrow principles gave both sides the power to block the release of funds, with or without a written agreement expressly saying so.

at approximately noon. The buyer's representative, Andrew Gallagher, had full access to the yacht, and offered full access to Glenn Straub once he arrived later that afternoon.

32   On the afternoon of February 12, 2009, Joshua Willis, as attorney-in-fact for the seller, and Andrew Gallagher, as attorney-in-fact for the buyer, attended the closing on the sale in the office of Bahamian lawyer Kirk Antoni. While at the closing, Joshua Willis signed the bill of sale for the vessel, which was notarized by Mr. Antoni.

33   It was known by all sides in advance that the seller's agent at the closing would be Mr. Willis. For example, before the closing buyer's counsel and the buyer's attorney-in-fact both received by email the legal paperwork to be executed in Freeport, including the "Bill of Sale to be executed in Freeport, Bahamas before Kirk Antoni." No one objected to the form or substance of the bill of sale, even though it was to be executed by "Joshua Willis, Attorney-in-Fact, Inspiration Yacht Charters, Inc." Pl.'s. Ex. 78. All parties understood and intended that Joshua Willis would execute the documents necessary to complete the purchase and sale of the vessel in the Bahamas.

34   Joshua Willis, for the seller, and Andrew Gallagher, for the

buyer, both executed a Protocol of Delivery and Acceptance for the vessel on behalf of Inspiration Yacht Charters, Inc. and Inspiration Yacht Charters II, Inc., respectively, in which the parties agreed that:

> The undersigned hereby attest that the vessel INSPIRATION, Official Number 4875, was delivered by Joshua Willis, as Attorney-in-Fact for Inspiration Yacht Charters, Inc. to Andrew Terence Gallagher, as Attorney-in-Fact for Inspiration Yacht Charters II, Inc., at Freeport, Bahamas, on February 12, 2009, and accepted by Buyer.

35   On February 12, 2009, Mr. Antoni faxed the closing documents to Allied Marine and Craig Galle in Florida, including the bill of sale signed by Joshua Willis and the Protocol of Delivery and Acceptance for the Vessel signed by both sides. Pl.'s Ex. 173. Mr. Galle's correct fax number appears on the fax and fax cover sheet was identified in Mr. Galle's files during discovery.[15]

## G.   **After the closing**

---

[15] Mr. Galle testified that he did not receive the fax transmission from Mr. Antoni on February 12, and never received any of the documents executed in the Bahamas until "well after February 13th." Galle Tr. 32, 36:5. Regardless, the buyer's theory of the case is that the Bahama documents were defective, not that they weren't received. More importantly, the buyer's representatives all knew the closing documents were to be executed in Freeport; Mr. Straub even visited Mr. Anotoni's office that afternoon. If Mr. Galle's office did not receive the critical fax confirming the $7,000,000 transaction, a reasoned response would have been to call Mr. Antoni or Allied Marine, which received the documents. Short of that, Mr. Galle could have called his client in Freeport, or conferred with Mr. Straub's maritime lawyers, who all knew the documents had been executed. See, e.g., Pl.'s Ex. 83.

36   Mr. Straub arrived in Freeport on the afternoon of February 12, 2009. He initially went to the law office of Mr. Antoni and called Captain Gallagher to ask whether or not Straub needed to perform anything with respect to the closing. Captain Gallagher told him he did not, and that the closing had been completed successfully. Mr. Straub arrived at the vessel in the early evening and spent time onboard. Later, Mr. Straub took the vessel's crew out to dinner, and he discussed his plans to move the vessel to a dock he owned in Fort Lauderdale.

37   Unbeknownst to the seller or IYC, Mr. Straub was aware the funds had not been released from escrow and were being held up because he had not personally authorized the transfer. While onboard the vessel on February 12, 2009, Mr. Straub witnessed phone calls in which the Captain tried to confirm seller's receipt of the funds. Despite knowing the he controlled release of the funds, Mr. Straub did not inform the Captain or anyone acting for the seller why the $7,000,000 had not yet been received.

38   Through his lawyers, Mr. Straub instructed Allied Marine not to release the funds in escrow, and Allied complied.

39   Once it became clear to the seller and the seller's agents that Mr. Straub did not intend to pay for the vessel, Frank

24

Grezszczak advised Mr. Visser not to allow Mr. Straub to spend the night onboard in Freeport. As a result, Mr. Straub was not permitted to stay on the vessel. Nevertheless, the Court accepts the credible trial testimony of Captain Gallagher that Mr. Straub was treated respectfully, fairly, and courteously.[16]

40    On the afternoon of February 12, 2009, after the closing had taken place at Mr. Antoni's law office, buyer's counsel in Florida raised questions about the legal sufficiency of the bills of sale to pass title.

41    Even accepting that the buyer had not waived objections to the bill of sale by executing the closing documents and taking possession of the yacht by executing the protocol of acceptance, the buyer's objections were timely cured by the seller.

42    On the day of the closing, the buyer's maritime counsel

---

[16] Mr. Straub was apparently offended by something Mr. Grzeszczak said in the context of disallowing Mr. Straub to stay on the vessel. As the Court previously wrote in ruling on discovery motions pertaining to Mr. Grzeszczak's comments, this is not the first time intemperate or unprofessional words were uttered between Floridian businessmen in the context of a contentious transaction. Mr. Grzeszczak apparently made the comments to Captain Gallagher over the phone, and Mr. Straub either overheard them or heard them second hand from the Captain. Straub Dep. 84-85, May 14, 2010. The words came after the buyer's failure to pay, and Mr. Grzeszczak later apologized. Regardless, the comments are irrelevant to the legal questions in this case.

drafted new legal documents for the seller to execute. These were: (1) new corporate resolutions, (2) a new power-of-attorney document, and (3) yet another (fourth) bill of sale, to be executed by the seller's newly-appointed attorney-in-fact, Girlie Ebbitt. The corporate resolutions not only authorized the fourth bill of sale, but also ratified any actions previously taken--including Mr. Willis's execution of the third bill of sale in the Bahamas. The seller executed these documents at the buyer's behest and within a short period of time.[17] There is no dispute that the bill of sale signed by Girlie Ebbitt was sufficient to transfer title to the buyer. Nevertheless, Craig Galle asked Tjerk Visser to execute yet another bill of sale in Holland at the law office of an attorney recommended by the buyer, and to obtain an apostille.[18] This bill of sale was executed by Tjerk Visser before a Dutch notary on February 19, 2009, and the Dutch attorney then provided the bill of

---

[17]Robb Maass, the buyer's chief maritime lawyer, testified that the corporate resolutions and new power of attorney (giving Girlie Ebbitt authority to sign a bill of sale) were received February 13, 2009. Further, Kelly Cool was in possession of the signed and notarized Girlie Ebbitt bill of sale by February 13, 2009 and a copy was sent to Mr. Maass the same day. Pl.'s Ex. 93. In any event, all the documents were received by the buyer within a few business days, at most.

[18]In other words, the seller received inconsistent instructions from the buyer's own lawyers. For instance, in the first set of post-closing documents prepared by Robb Maass and emailed to the seller, the attorney-in-fact for the bill of sale was to be Girlie Ebbitt, a local broker in Florida. By contrast, according to a letter written the same day by Craig Galle, the bill of sale was supposed to be executed by Tjerk Visser in Holland. Pl.'s Ex. 95.

sale together with an apostille to counsel for the seller, which was received the first week of March 2009. Pl.'s Ex. 121. By this point, the seller undeniably cured all objections raised by the buyer regarding both passage of title and the ability to transfer title on the St. Vincent registry.[19]

43   The evidence at trial established that time was not "of the essence" under the Agreement. Among other things, the Court notes that: (1) the closing date was already postponed twice; (2) on the day of the closing, Mr. Straub himself proposed that he and the Captain move the vessel back to Fort Lauderdale to sort things out;[20] (3) the buyer never expressly sought an apostille from Mr. Visser until after the closing date; and (4) after the closing buyer's maritime counsel provided the seller with new documentation, which included a ratification of all actions prior to the closing. Additionally, one day after the closing, buyer's other lawyer wrote the seller to identify perceived defects in the

---

[19] As stated above, the evidence at trial did not convince the Court that the buyer's objections about the documentation from the February 12 closing were not waived when the buyer accepted the vessel at the closing, or cured when the plaintiff executed corporate resolutions ratifying the Willis bill of sale. In any event, the evidence and testimony proved that the objections were all timely cured.

[20] Captain Gallagher wrote Tjerk Visser on the night of the closing reporting that "Mr. Straub wanted to stay on board Inspiration this evening and travel back to the USA, with Tjerk remaining the owner and close after the required paperwork was completed tomorrow, 6 miles off shore." Pl.'s Ex. 86.

closing documents, in which counsel requested the seller to "obtain proper, legal transfer documents to effectuate the sale" and that "[o]nce these documents are obtained," the buyer will review them and "fund and close the transaction." Pl.'s Ex. 101. Clearly, no one involved in the sale believed that the Agreement was so "of the essence" that the seller would not be allowed a reasonable period of time to fix perceived problems in good faith.

44   On February 18, 2009, three business days after Craig Galle sent his first letter to the seller requesting a Holland bill of sale with an apostille, Mr. Galle faxed a second letter to the seller reporting that the buyer deemed the sale terminated because the seller breached the Agreement. See Pl.'s Ex. 114. Mr. Galle demanded return of the full purchase price of $7,000,000 (including the deposit). The reasons cited for the termination were, first, the seller failed to close on the sale on February 12 because of "(i) a Seller's affidavit with incorrect dates and (ii) documents that were signed in Holland having a notary stamp from Broward County," i.e., referring to the improperly notarized bill of sale that was never used. Second, Mr. Galle noted that "[o]n February 13, 2009, Purchaser demanded that Seller 'obtain proper, legal transfer documents to effectuate the sale of the Vessel which include bills of sale for the Vessel and its tenders Notarized in Holland. . . with a Holland apostille.' To date, six (6) days later, this has still not occurred and, thus, [buyer's counsel]

28

cannot confirm a clean transfer of title to the Vessel." <u>Id.</u>

### III.   Conclusions of law

#### A.   Jurisdiction and venue

The Court has subject matter jurisdiction under 28 U.S.C. § 1332 as an action by a foreign citizen against citizens of the state of Florida involving more than $75,000, exclusive of interest and costs. Subject matter jurisdiction is also proper under 28 U.S.C. § 1333 because the action is a dispute over title to a vessel in navigation and the suit was brought pursuant to Federal Rule of Civil Procedure 9(h) and Supplemental Rule D, invoking the Court's admiralty or maritime jurisdiction.

45   No party disputes the Court's personal jurisdiction over the defendants, and personal jurisdiction is proper under Florida Statute § 48.193.

46   Venue is proper in the Southern District of Florida because a substantial part of the events or omissions giving rise to the claim occurred in Palm Beach County and Broward County, Florida.

#### B.   Seller's breach of contract claim against buyer

47   All parties agree that Florida law governs this dispute. "Under Florida law, the elements of a breach of contract action are

29

(1) a valid contract; (2) a material breach; and (3) damages."
Bland v. Freightliner LLC, 206 F. Supp.2d 1202, 1210 (M.D. Fla.
2002) (citing Abruzzo V. Haller, 603 So. 2d 1338, 1240 (Fla. 1st
DCA 1992)). In addition, to maintain a contract claim, "a claimant
must also prove performance of its obligations under the contract
or a legal excuse for its nonperformance." Rollins, Inc. v.
Butland, 951 So. 2d 860, 876 (Fla. 2nd DCA 2006). The first party
committing a substantial breach of a contract cannot maintain an
action against the other contracting party for a subsequent failure
to perform. See Popular Bank v. R.C. Asesores Financieros, C.A.,
797 So. 2d 614, 622 (Fla. 3rd DCA 2001).

48    With respect to the first and third elements of the
plaintiff's contract claim, the evidence establishes (and the
parties do not dispute) that the "Brokerage Purchase and Sale
Agreement" was a valid contract, and it contained a liquidated
damages clause setting the seller's damages in the event of the
buyer's breach.[21]

49    In the event of the buyer's breach, the stipulated damages
amount was the buyer's $690,000 deposit, to be divided 50/50

---

[21]The Brokerage Agreement is given effect by the buyer's signed
"Acceptance of Vessel" and the "Assignment of Purchase and Sale
Agreement" between KKA and Inspiration Yacht Charters II. See Am.
Compl. Ex. A, B, and C.

between the seller and the two brokers. This sum is not disproportionate to the speculative damages the seller might reasonably incur as a result of the buyer's breach (such as payment of crew salaries, insurance, dockage and operating costs, and costs associated with re-marketing and selling the vessel). The contractual liquidated damages provisions are reasonable and enforceable. See Lefemine v. Baron, 573 So. 2d 326, 328 (Fla. 1991) (home buyer's forfeiture of a ten percent deposit was not excessive as liquidated damages).

50   Having established the first and third elements of the plaintiff's breach of contract claim, the principal question at trial was the second element: whether the seller "prove[d] performance of its obligations under the contract," see Butland, 951 So. 2d at 876, and if so, whether the buyer subsequently committed a breach by failing to pay for the vessel.

51   The Uniform Commercial Code, as adopted by the Florida Legislature (the "UCC"), governs the sale of goods. See Fla. Stat. § 672.102. Goods are defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (chapter 678) and things in action." Fla. Stat. § 672.105. Both parties agree that the vessel

31

in question is a good, the sale of which is governed by the UCC.

52   On February 4, 2009, the buyer accepted the goods (*i.e.*, the vessel), and delivered a signed document entitled "Acceptance of Vessel" to the seller, which acknowledged that all conditions upon its acceptance had been performed or were waived.  The buyer also agreed to accept delivery of the vessel and pay the balance of the purchase price due under the Agreement. Finally, the buyer directed the escrow agent, Allied Marine, to pay the deposit to the seller if the buyer failed to close on the yacht as required by the "Acceptance of Vessel" and the Brokerage Agreement.

53   Under the UCC, acceptance of goods occurs when a buyer "[a]fter a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that the buyer will take them in spite of their nonconformity."  Fla. Stat. § 672.602. In this case, the buyer accepted the vessel in writing, signifying that it goods were conforming, and the Court finds that acceptance of the vessel occurred. See Euroworld of California, Inc. v. Blakely, 613 F. Supp. 129, 133 (S.D. Fla. 1985).  Additionally, according to the UCC, "[a]cceptance of goods by the buyer precludes rejection of the goods accepted." Fla. Stat. § 672.607(2).

54   Despite the buyer's acceptance of the vessel, the buyer failed

32

to pay. Under the UCC, "a buyer's failure to pay for goods 'accepted' constitutes a breach of a sales contract." <u>Lockheed Martin Corp. v. Galaxis USA Ltd.</u>, 222 F. Supp. 2d 1315, 1324 (M.D. Fla. 2002) (<u>citing</u> Fla. Stat. § 672.607(1)). Moreover, failure to pay for goods accepted is a material breach. <u>Validsa, Inc. v. PDVSA Servs.</u>, 632 F. Supp. 2d 1219 (S.D. Fla. 2009). In light of the governing legal principles, the seller proved by a preponderance of the evidence that the buyer materially breached the Agreement by failing to pay for the accepted vessel, thus satisfying the final element of the plaintiff's breach of contract claim.

55   As Affirmative Defenses to the plaintiff's amended complaint, the buyer asserts that it was relieved from its obligation to perform under the Agreement because of, (1) the "first to breach" doctrine, and (2) the seller's repudiation of the contract. <u>See</u> Def.'s Answer to Pl.'s Am. Compl., pp. 7-9, May 11, 2009, ECF No. 52. Under Florida law, a party is indeed relieved from its duty to perform under a contract and may terminate the agreement when the other contracting party has breached a material term of the contract. The Florida Supreme Court has written that:

> A material breach, as where the breach goes to the whole consideration of the contract, gives to the injured party the right to rescind the contract or to treat it as a breach of the entire contract-in other words, an entire or total breach-and to maintain an action for damages for a total breach. Whenever there is a total breach of a contract by one party to it, the other is at liberty to treat the contract as broken and desist from any further

> effort on his part to perform it. In other words, he may
> abandon it and recover as damages for the breach the
> profits he would have received by a full performance.
> Such an abandonment is not technically a rescission of
> the contract, but a mere acceptance of a situation
> created by the wrongdoing of the other party.

Hyman v. Cohen, 73 So. 2d 393, 397 (Fla. 1954) (quoting 12 Am. Jur.

Contracts § 389). In this case, both of the buyer's Affirmative

Defenses concerning the seller's alleged breach and/or repudiation

are premised on the buyer's contention that the seller failed to:

> (i) deliver, at the closing, proper legal documents to
> effectuate a lawful transfer of title to the Vessel to
> [buyer], (ii) deliver the Vessel to [buyer] in the
> Bahamas on February 12, 2009, and (iii) permit [buyer's]
> representative access to the Vessel on February 12, 2009
> in the Bahamas.

Def.'s Answer to Pl.'s Am. Compl., pp. 7-9. However, the evidence

presented at trial did not substantiate these or any other defenses

to the buyer's failure to perform under the contract. First, to the

extent that any of the legal documents executed on or before the

closing were unsatisfactory to the buyer, the defects were timely

cured when the seller executed new legal documents, including a

ratification of all previous actions by the seller's agents. The

buyer's lawyers approved the form and substance of the post-closing

documents, including the ratification, and the seller completed the

paperwork within a reasonable period of time, as requested. When

one of the buyer's other representatives requested even more

documentation from Holland, the seller complied. If the buyer had

other *bono fide* objections to documentation required by the

Agreement, the buyer would have raised them at this time.[22] Indeed,

there was never any doubt that the seller intended to do whatever

was necessary to appease the buyer or buyer's counsel. Second, the

seller did, in fact, deliver the vessel to the buyer in the Bahamas

as scheduled. Third, evidence at trial established that the seller

never unreasonably denied the buyer's access to the vessel.


56   The contract did not contain a "time is of the essence"

clause, and such clause was not a material term of the parties'

---

[22] In the February 13, 2009 correspondences from the buyer's
various lawyers, no one challenged the seller's personal guaranty
documents. Jeffrey Cox reviewed the seller's warranty of title
(Pl.'s Ex. 70, "Warranty of Title"; the document also appears as
Pl.'s Ex. 67) along with the certificates of incumbency documenting
the beneficial ownership of Inspiration Yacht Charters, Inc. (Pl.'s
Ex. 80 and 122), all of which were provided to the buyer either
before the closing or soon after. Mr. Cox concluded that the form
and substance of the seller's warranty of title was proper and it
met the requirements of Paragraph 15 of the Agreement for the
seller to provide "a personal guaranty and indemnification from the
Seller's beneficial owner guaranteeing the Vessel's title and lien
free status." Cox Tr. 30-34. The Court agrees with Mr. Cox's
conclusion. All the necessary language is included in the "Warranty
of Title"--a standardized document prepared by Allied Marine to
satisfy the personal guaranty and indemnification requirement in
Allied's standardized Brokerage Agreement. Although the buyer's
trial lawyer questioned Mr. Visser about whether all the pages of
this document were successfully faxed to the brokers in Florida,
Craig Galle acknowledged receiving them before the closing date so
the fax obviously was successful. Galle Tr. 19-20. The buyer cannot
escape the fact that it intended for the vessel to be moved to the
Bahamas after the buyer's representatives were sent copies of the
documents, and the buyer's authorized agent signed protocols of
delivery and acceptance. When the buyer's lawyers raised questions
about certain aspects of the paperwork, which could have been
discovered all along, the seller was left with neither the money
nor clear title to the vessel.

Agreement. Even if it were, the Court concludes by a preponderance of the evidence that the buyer intended to and did waive this aspect of the Agreement by proposing that the closing be continued, and by presenting new obligations for the seller to perform after the closing date.

57    Based on the foregoing conclusions and all the evidence presented at trial, the Court finds that the buyer's claim against the seller for breach of the contract is without merit. All causes of action or claims for relief asserted by the buyer against the seller based on the seller's alleged non-performance are thus rejected and denied. The Court concludes that the buyer breached the Agreement by failing to pay the agreed-upon purchase price for the vessel even once it was beyond dispute the seller performed its obligations under the Agreement within a reasonable period of time.

C.    **Seller's breach of contract and breach of fiduciary claims against Allied Marine**

58    All parties acknowledge that at times relevant to this lawsuit, Allied was acting in two capacities: as the seller's agent with respect to the yacht sale (owing a fiduciary duty to the seller); and as escrow agent with respect to the buyer's purchase funds (owing a fiduciary duty to both sides). It can also be said that Allied's conduct surrounding the yacht sale fell into separate spheres: conduct governed by its duties under the written Brokerage

36

Agreement between seller, buyer, and Allied; and conduct that was not explicitly governed by the Brokerage Agreement, such as Allied's acceptance of the purchase funds before closing.

59    In the amended complaint, the plaintiff asserts two counts against Allied. Count I is the plaintiff's breach of contract claim, which alleges, in part, that:

> 36. Inspiration I and Allied entered into a contract, the terms of which are evidenced by the Agreement attached hereto as Exhibit "A", whereby Allied agreed to transfer seven million dollars ($7,000,000.00), representing funds it held in escrow for the benefit of Inspiration I, to Inspiration I upon completion of the closing of the Vessel and transfer of Inspiration I's ownership interest in and title to the Vessel to Inspiration II.

> 37. In accordance with the terms of the Agreement, Inspiration II placed the Deposit and the balance of the purchase funds at issue in escrow with the selling broker Allied for the benefit of Inspiration I, to be disbursed upon transfer of Inspiration I's ownership in and title to the Vessel to Inspiration II.

> 38. After Inspiration I transferred its ownership in and title to the Vessel to Inspiration II, Allied breached the foregoing contract by refusing to disburse the funds held in escrow to Inspiration I.

Pl.'s Am. Compl. ¶¶ 36-38. The plaintiff's breach of fiduciary duty claim in Count II is substantially similar, see id. at ¶¶ 40-46, adding, for instance, that, "based on the Agreement and agency and brokerage relationship between Inspiration I and Allied, a relationship of trust and confidence resulted between Inspiration I and Allied, such that Inspiration I trusted Allied, pursuant to

37

the Agreement, to release the funds Allied held in escrow [to Inspiration I] upon the completion of the closing of the Vessel." Id. at ¶ 43.

60   As an initial matter, the Court notes that the plaintiff's presentation of its case against Allied at trial did not hew closely to the allegations in the plaintiff's amended complaint. For example, in the courtroom the plaintiff's witnesses expressly denied that the Agreement called for Allied to hold the $7,000,000 in escrow; the theory at trial was that Allied held only the $690,000 deposit in escrow pursuant to the Agreement, and held the balance of the $7,000,000 pursuant to an *ex parte* arrangement with the buyer. These arguments partially contradict the pleadings (*e.g.*, "[as] evidenced by the Agreement. . . Allied agreed to transfer seven million dollars ($7,000,000.00), representing funds it held in escrow. . . ." and so forth. Am. Compl. ¶¶ 36-38). Similarly, in the courtroom the plaintiff seemed to abandon its position from the pleadings that Allied's breach of duty was its refusal to release the $7,000,000 from escrow, and instead argued that Allied's unlawful disloyalty was its failure to disclose it received the $6,310,000 "in escrow" to begin with.

61   In any event, to the extent the seller attempted to establish Allied acted improperly in any capacity by refusing to immediately

38

release the purchase funds to the seller in the Bahamas, this claim fails. The $690,000 deposit was in escrow by written agreement between all parties; the $6,310,000 balance was in escrow because that was Mr. Straub's preference, and it was fundamentally up to Mr. Straub to decide where to hold the money until the closing as long as it was positioned to clear as required by the Agreement. Mr. Straub decided to transfer the money to Allied's escrow account. Once the money was there, it could not be released unless both sides agreed, or if they could not agree, upon a court order. On February 12, 2009, the buyer's maritime lawyers raised questions about the transfer of title and the buyer therefore instructed Allied to hold the money until the parties worked out a solution. By February 18, the buyer no longer wanted to purchase the vessel and demanded that Allied return the full $7,000,000. In response, the seller immediately instructed Allied *not* to release any of the funds. Facing these conflicting demands, Allied was not in a position to decide which side was correct. Indeed, the very question faced by Allied at the time--*did the seller provide the necessary documents to close the sale?*--was the subject of this four-day bench trial, which the parties litigated with the benefit of extensive legal resources and discovery. Certainly, an escrow agent is not compelled to adjudge the merits of a complex legal dispute between its duel principals. Consequently, the plaintiff has not established that Allied breached the contract or its

39

fiduciary duties by failing to release the purchase money from escrow.[23] Whether Allied is liable for *failing to disclose* material facts about the escrow arrangement is a separate question, discussed below.

62   The seller also attempted to establish that Allied acted improperly as the seller's broker, by failing to inform the seller that Allied could not release the $6,310,000 without the buyer's approval. The elements of a claim for breach of fiduciary duty are: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damages. See Gracey v. Eaker, 837 So. 2d 348, 353 (Fla. 2002). "A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of that relation." Id. at 354. A broker or agent owes a fiduciary duty of loyalty and full disclosure. See Frey v. Fraser Yachts, 29 F.3d 1153, 1156 (7th Cir. 1994) (citing Young v. Field, 548 So. 2d 784, 786 (Fla. 4th DCA 1989)). "Concealment of material facts known to the broker will

---

[23] With respect to the deposit, although Paragraph 13 of the Agreement instructs that the deposit "*shall* be retained by the Seller and Broker" upon the buyer's breach (emphasis added), and the buyer's "Acceptance of Vessel" document states that, "[i]n the event the purchaser fails to close this transaction as specified, the escrow agent is directed to forthwith pay the escrow deposit to the seller," these provisions are not a mandate for Allied to unilaterally decide whether the closing documents were sufficient. Rather, it is clear that the same escrow principles applied to the deposit as well as the balance of the purchase price. See Cox 64:22, 65:19.

forfeit his right to compensation for his services." <u>Kline v. Pyms
Suchman Real Estate Co.</u>, 303 So. 2d 401, 405 (Fla. 3d DCA 1974),
cert. denied, 314 So. 2d 588 (Fla. 1975). Florida law holds that
the fiduciary duty of dealing honestly and with good faith towards
a principal is breached "where there is a showing of fraud, deceit
or absence of good faith" on the part of the agent. <u>Messer v. E.F.
Hutton & Co.</u>, 833 F.2d 909, 920 (11th Cir. 1987) (citing Florida
cases), amended on reh'g on other grounds, 847 F.2d 673 (11th
Cir. 1988). Thus, a showing of mere negligence is not enough to
demonstrate a breach of fiduciary duty. <u>See generally Maliner v.
Wachovia Bank, N.A.</u>, 2005 WL 670293, at *9 (S.D. Fla. 2005) (noting
that more than mere negligence was required to recover for breach
of fiduciary duty); <u>Berges v. Infinity Ins. Co.</u>, 896 So. 2d 665,
687 (Fla. 2004) (noting in an insurance context that breach of
fiduciary duty requires demonstration of more than mere
negligence).

63   With respect to the first element of the claim--existence of
a fiduciary duty--Allied owed the seller a duty to disclose
material facts within Allied's knowledge pertaining to matters
within the scope of the seller-broker relationship. Regardless of
which "capacity" Allied was acting when it (1) accepted the buyer's
$6,310,000, and (2) placed that sum into an escrow account, either
way these matters were "within the scope" of Allied's fiduciary

41

relationship with the seller.[24] Allied expressly informed the seller that the $6,310,000 had been received, but Allied did *not* expressly inform the seller the funds were received "in escrow." The question, thus winnowed, is whether Allied's placement of the money into escrow without explaining this detail to the seller equates with a "breach of duty," which is the second element of the breach of fiduciary duty claim in Count II.

64   The answer is that Allied's failure to inform the seller on this point was not a breach of duty because the seller knew everything it needed to know. Both sides called expert witnesses to offer opinions related to Allied's disclosure duties. When Jeffrey Cox was questioned by counsel for Allied Marine, he explained the customs in the industry concerning the use of escrow accounts in boat transactions:

Q:   Now, how many yacht transactions have you handled?
A:   Hundreds.
Q:   Hundreds. In these hundreds of yacht transactions have you ever heard of a buyer sending an amount in excess of $6 million to the seller in advance of the closing with no strings attached?
A:   No.
Q:   If it goes to anybody, there's going to be some sort of escrow or something like that, correct?

---

[24]   At trial the seller focused on "seller-to-broker relationship" as the source of Allied's disclosure duties. Allied owed similar disclosure duties to the seller as escrow agent for the purchase funds. See Watkins v. NCNB Nat'l Bank, N.A., 622 So. 2d 1063, 1064 (Fla. 3rd DCA 1993). Suffice it to say, Allied had a duty to disclose material facts about the escrow and could be liable for violating that duty.

A:   Correct.
Q:   That's uniformly the case?
A:   Correct.

\* \* \*

Q:   So when Allied said to IYC, to Frank Grzeszczak or Joyce
     Browning who told Frank Grzeszczak who was pleased, that
     [Allied] had the funds, anybody with any knowledge whatsoever
     of yacht financing knew that those funds were in escrow, or
     had some sort of strings attached to them to protect the
     buyer, correct?
A:   Well, they knew that the funds were held in an account that
     was governed by Florida law with respect to yacht brokerages.
Q:   Okay. And they would be imposing on Allied the duties of an
     escrow?
A.   Correct.
Q:   And the duty of an escrow in that instance is with two
     principals, buyer and seller, not to disburse until both
     authorize it to be done, correct?
A:   Well, generally. That's generally correct. And, you know, the
     terms of the disbursal or disbursion, the sending the money
     out, those terms are typically agreed in advance between the
     parties.

Cox. Tr. 75:18-76:3, 76:20-77:11. This explanation was confirmed by

Allied's expert on vessel closings, Steven Hibbe,[25] who correctly

pointed out that Allied's announcement to the seller that Allied

was holding the buyer's $6,310,000 was the only disclosure that was

necessary, because at that point anyone in the industry would have

known that Allied received the money "in escrow" rather than an

ownership account. Hibbe Tr. 8. According to Mr. Hibbe, it is

irrelevant that there was no formal escrow agreement concerning the

balance of the purchase price, because participants in yacht

transactions do not necessarily utilize such agreements and brokers

---

[25] Mr. Hibbe was tendered as an expert without objection and
accepted by the Court.

often use their escrow accounts to hold purchase funds pending a closing. Id. at 12. Mr. Hibbe opined that terms of Paragraph 15 of the Agreement permitted the money to be put in escrow, and those terms were sufficient to make it clear the money was subject to principles of Florida escrow law once Allied received it. Id. at 17-19. Further, both experts accepted that in the absence of any explicit terms or conditions concerning the escrow arrangement, ordinary escrow principles of Florida law apply.[26]

65    Further, Mr. Hibbe's expert opinions about Allied's duties as an escrow agent were essentially uncontroverted. He testified that, "it's known throughout the industry by all participants, brokers, maritime attorneys, others involved, that when funds go into an escrow account like that, it's *pending closing*." Hibbe Tr. 8:2-4 (emphasis added). He added that the buyer's lawyer traditionally will consent to the release of funds only once he or she has confirmed the transaction closed, and thus the fact that Allied's release of money was conditioned on the buyer's approval (see Pl.'s Ex. 64) was not a "secret" at all and cannot be the predicate non-

---

[26] Buyer's trial counsel drew attention to a draft of an escrow agreement prepared by Craig Galle containing signature blocks for: Inspiration Yacht Charters, Inc.; Inspiration Yacht Charters II, Inc.; Allied Marine; and the buyer's counsel from Chapman & Galle. Pl.'s Ex. 158. The document was never signed by either Allied or the seller, and was apparently never presented to the seller. As Mr. Cox observed from the witness stand, the document was a draft with no legal effect and was discarded. Cox Tr. 72-73.

44

disclosure for a breach of fiduciary duty claim. Finally, both experts readily acknowledged that if the money had not been put into escrow, it would have been held in one of the buyer's private accounts until the closing, and the buyer obviously would have been able to do exactly what the buyer did do--withhold the money. Thus, the experts concurred that all things considered the escrow arrangement actually benefitted the seller.

66    Upon consideration of the expert testimony and the other evidence in the case, the Court is satisfied that Allied's placement of the buyer's purchase funds into escrow should have been obvious to all involved. Once the money was in escrow, Allied was duty-bound to respect instructions from either side concerning release of funds. Contrary to the plaintiff's assertions, Allied and the buyer did not agree to any undisclosed terms or conditions regarding the release of the money; Allied did not add to or subtract from the ordinary escrow principles that establish the well-known duties of escrow agents under Florida law, including the fact that an escrow agent owes a fiduciary duty to both sides. Upon hearing the conflicting instructions from buyer and seller with respect to the $7,000,000, Allied did the only thing it could do. See Cox 81:11-22. Thus, the Court finds that Allied did not breach its disclosure duties, or any other fiduciary duty owed to the seller.

45

67   Even if the seller had established that Allied's failure to
disclose the well-known duties of an escrow agent constituted a
breach of duty, the seller's claim would still fail because the
seller's evidence did not establish the non-disclosure was the
proximate cause of any damages. This conclusion is demonstrated by
a familiar "but for" analysis: but for the fact that Allied
received the balance of the purchase price in escrow before the
closing, the seller still would have taken the vessel to the
Bahamas and the transaction would have proceeded with the same
result, since the balance of the purchase price would have been in
one of Mr. Straub's private accounts and under his exclusive
control (as allowed by the Agreement). But for the fact that the
buyer expressly conditioned Allied's release of the funds from
escrow upon authorization from buyer's counsel, once the funds were
in escrow Allied *still* would have insisted upon authorization from
the buyer before releasing any funds. Under any realistic financing
scenario, Mr. Straub would have retained the power to block payment
if his lawyers were worried about the paperwork, and the seller
would have to bear the risk of non-payment. Thus, the plaintiff has
also failed to prove the proximate cause element of its claim.

68   Accordingly, the plaintiff has not established any liability
on the party of Allied for the plaintiff's claims in Counts I or II

of the amended complaint. The plaintiff's claim for consequential

damages is denied. The plaintiff's claim that Allied must forfeit

its share of the liquidated damages is also denied.[27]


**D.**   **Allied's claim for attorney's fees**
         **against seller and buyer**

69    Allied contends it is entitled to recover attorney's fees from

the seller and/or the buyer which Allied incurred in defending this

lawsuit. The attorney's fee provision in Paragraph 22 of the

Agreement provides:

> 22. Should the Broker become a party to any litigation
> involving this Agreement, it is agreed that the Broker
> shall be reimbursed for its costs and attorney's fees by
> the party or parties who have been found to have breached
> this Agreement.

Agreement ¶ 22. The operation of Paragraph 22 is unambiguous: If a

Allied is embroiled in a dispute about rights and obligations

created by the Brokerage Agreement, and if and when any party is

determined to have breached the Agreement, that breaching party

---

[27] Shortly after the bench trial the plaintiff submitted a
"Notice of Filing Supplemental Legal Authority" in support of its
claim for attorney's fees against Allied. Plaintiff contends that
Allied's conduct as broker caused this litigation and as a
consequence Allied can be liable under Florida law for the
attorney's fees incurred by the plaintiff in prosecuting claims
against both defendants. Because the Court does not agree that
Allied engaged in any wrongful conduct, this aspect of the
plaintiff's case against Allied is also denied.

must reimburse Allied's attorney's fees.[28] The breaching party is liable for Allied's attorney's fees regardless of whether it was the party who commenced litigation or named Allied as a defendant.

70    The first question is whether Allied was sued as a broker in relation to the Agreement. In Count I of the plaintiff's amended complaint, the plaintiff alleges that, "evidenced by the Agreement. . . Allied agreed to transfer seven million dollars ($7,000,000.00), representing funds it held in escrow [to the seller upon the closing]" and "Allied breached the foregoing contract by refusing to disburse the funds held in escrow." Am. Compl. ¶¶ 36, 38. Count II contains similar allegations, also demonstrating that Allied was sued pursuant to the Agreement. As discussed above, by the time plaintiff's counsel delivered opening arguments many months later the seller's theory of the case had changed considerably, with the seller ultimately arguing that it was never made aware the $7,000,000 was being held in an escrow account (let alone an account that was "evidenced by the Agreement," id. at ¶ 36).[29] Nevertheless, in the pleadings as well

_____

[28] No party has advanced a different interpretation of the language in Paragraph 22, which is part of Allied's standard Brokerage Agreement form that it uses in brokering vessel transactions.

[29] The allegations in the complaint were drafted within mere days of the buyer's termination of the transaction and in the context of the seller's request for emergency intervention by the Court, so it is not surprising that counsel's understanding of what

48

as the courtroom, the seller's position was that Allied violated the duties created by the Brokerage Agreement and, as a result, it is undeniable that Allied has indeed "become party to [a] litigation involving [the] Agreement." <u>See</u> Agreement, ¶ 22.

71   The seller cannot be contractually responsible for Allied's attorney's fees, however, because the seller does not fall into the category of a "party or parties who have been found to have breached [the] Agreement." <u>Id.</u> at ¶ 22.

72   The buyer commenced an action against Allied in state court in Palm Beach County February 19, 2009.[30] The case was removed to federal court March 10, 2009. In Count II of its complaint, the buyer explicitly sought relief from Allied under the Brokerage Agreement, alleging that "Allied Marine [has] breached the Agreement by failing and/or refusing to return the $7,000,000.00 to Inspiration II." Indeed, the $7,000,000 claim included the $690,000 security deposit, which was held by Allied pursuant to the Brokerage Agreement. As a result, that lawsuit also involved Allied's performance of obligations under the Agreement, caused Allied to "become party to [a] litigation involving [the]

---

happened might develop.

[30] The buyer's complaint appears in Civil Action No. 09-80405 at ECF. No. 1.

49

Agreement," and triggered the attorney's fee provision in Paragraph 22.

73   In sum, although both the seller and the buyer sued Allied for breach of the Brokerage Agreement, only the buyer is liable for Allied's attorney's fees under Paragraph 22 of the Agreement because the buyer breached the Agreement and the seller did not. Allied has not forfeited its right to reimbursement based on any theory of "unclean hands," disloyalty, or estoppel, because there is no evidence Allied did anything wrong in the underlying transaction, or in the course of litigation.

## IV.   Damages

74   Because of the Court's above findings and conclusions, and pursuant to the liquidated damages clause in the Agreement, the buyer forfeits the $690,000 security deposit as a consequence of its breach of contract. Paragraph 13 of the Brokerage Agreement provides that: "Buyer and Seller agree that the forfeited Deposit shall be divided equally with fifty percent (50%) of the Deposit disbursed to Seller and fifty percent (50%) of the Deposit disbursed to the Broker(s)." In this case, there were two brokers, IYC and Allied Marine. Because IYC is not a party to this lawsuit and there was no evidence about how the deposit was to be divided between the two brokers, the plaintiff and Allied Marine are

directed to file written submissions within twenty days as to how the deposit is to be divided.[31] The Court will schedule a hearing on this issue by separate order.

75   The buyer, Inspiration Yacht Charters II, Inc., is contractually required to reimburse Allied Marine's reasonable attorney's fees. The parties stipulated prior to trial that the amount of attorney's fees would be determined in post-trial hearings, if necessary. Thus, the Court will set a hearing by separate order to address the amount of attorney's fees.

## V.   Final Judgment

In summary, the seller has prevailed in its breach of contract case against the buyer; therefore, the seller is entitled to keep the buyer's $690,000 security deposit, to be divided with the brokers pursuant to the contract. However, the seller has not prevailed in its claim for consequential damages against Allied Marine, because the seller failed to establish that Allied breached any contractual or fiduciary duty. Finally, Allied sought attorney's fees from both the seller and/or the buyer. Allied has prevailed in its claim for attorney's fees against the  buyer,

---

[31] At trial, the plaintiff introduced a "Commission Agreement" between IYC and Allied Marine (Pl.'s Ex. 9) dated February 4, 2009 discussing their commission rates. The copy of the agreement presented to the Court is illegible.

only, and the buyer shall be responsible for reimbursing Allied for attorney's fees.

Pursuant to the Federal Rules of Civil Procedure 52 and 58, this Court's Findings of Fact and Conclusions of law, entered on this day, December 1, 2010, and for good cause shown, it is hereby

**ORDERED AND ADJUDGED:**

1. Final judgment is hereby entered in favor of the plaintiff, Inspiration Yacht Charters, Inc., and against the defendant, Inspiration Yacht Charters II, Inc., on Count IV of the plaintiff's Amended Complaint for breach of contract. Pursuant to the terms of Brokerage Agreement, Inspiration Yacht Charters II, Inc., shall forfeit the $690,000 security deposit held in escrow by Allied Marine. The Court will set a hearing by separate order for the parties to present evidence and arguments concerning how the deposit funds shall be divided between the seller, Allied Marine, and IYC.

2. Final judgment is hereby entered against the plaintiff, Inspiration Yacht Charters, Inc., and in favor of the defendant Allied Marine, Inc., on the plaintiff's claims in Count I (breach of contract) and Count II (breach of fiduciary duty) of the Amended Complaint.

3.    Final Judgment is hereby entered against the counter-claimant Allied Marine, Inc., and in favor of the counter-defendant, Inspiration Yacht Charters, Inc., with respect to Allied Marine's counterclaim for attorney's fees.

4.    Final Judgment is hereby entered in favor of cross-claimant Allied Marine, Inc., and against the cross-defendant, Inspiration Yacht Charters II, Inc., with respect to Allied's claim for attorney's fees. The amount of attorney's fees will be decided after briefing from the parties and a hearing, to be set by separate order.

**DONE AND ORDERED** in Miami, Florida, December 1, 2010.

WILLIAM M. HOEVELER
UNITED STATES DISTRICT COURT JUDGE

53